# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | |
|---|---|
| GREEN GROUP HOLDINGS, LLC, a Georgia limited liability company, and HOWLING COYOTE, LLC, a Georgia limited liability company,<br><br>Plaintiffs,<br><br>vs.<br><br>MARY B. SCHAEFFER, ELLIS B. LONG, BENJAMIN EATON, and ESTHER CALHOUN, as individuals and as members and officers of BLACK BELT CITIZENS FIGHTING FOR HEALTH AND JUSTICE, an unincorporated association,<br><br>Defendants. | No. 2:16-cv-00145-CG-N<br><br>JUDGE CALLIE V. S. GRANADE<br><br>MAGISTRATE JUDGE KATHERINE P. NELSON |

**REPLY BRIEF IN SUPPORT OF DEFENDANTS' MOTIONS FOR ADMISSION *PRO HAC VICE* OF LEE ROWLAND, BENJAMIN GOOD, RACHEL GOODMAN, AND DENNIS PARKER PURSUANT TO LOCAL RULE 83.3(d)**

# Table of Authorities

**Cases**

*Allen v. Molton, Allen & Williams Realty Co.*, 495 So. 2d 27 (Ala. 1986) ..................................... 4

*Blu-J, Inc. v. Kemper C.P.A. Grp.*, 916 F.2d 637 (11th Cir. 1990) ................................ 3

*Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) ......................................... 2

*Carney v. Am. Univ.*, 151 F.3d 1090 (D.C. Cir. 1998) ................................... 4

*Chi. Council of Lawyers v. Bauer*, 522 F.2d 242 (7th Cir. 1975) ................................ 3, 5

*FTC v. Lalonde*, 545 F. App'x 825 (11th Cir. 2013) ..................................... 7

*Gentile v. State Bar of Nev.*, 501 U.S. 1030 (1991) ..................................... 5

*Heffernan v. Hunter*, 189 F.3d 405 (3d Cir. 1999) ..................................... 6

*In re BellSouth Corp.*, 334 F.3d 941 (11th Cir. 2003) ................................... 6

*In re Evans*, 524 F.2d 1004 (5th Cir. 1975) ................................... 2

*Joyce v. Town of Dennis*, 736 F. Supp. 2d 321 (D. Mass. 2010) ................................... 5

*Kmart, Inc. v. Asaro*, 751 So. 2d 513 (Ala. Civ. App. 1999) ......................................... 4

*Potashnick v. Port City Constr. Co.*, 609 F.2d 1101 (5th Cir. 1980) ............................... 7

*Resolution Trust Corp. v. Blasdell*, 154 F.R.D. 675 (D. Ariz. 1993) ........................... 3

*Sanders v. Russell*, 401 F.2d 241 (5th Cir. 1968) ........................... 6

*Schlumberger Techs., Inc. v. Wiley*, 113 F.3d 1553 (11th Cir. 1997) ............................... 2

*Uforma/Shelby Bus. Forms, Inc. v. N.L.R.B.*, 111 F.3d 1284 (6th Cir. 1997) ............................... 4

**Rules**

Ala. R. of Prof'l Conduct 3.6 ............................................................. 2, 3, 4, 5

Civ. L.R. 7 ............................................................................................. 1

Fed. R. Evid. 408 ............................................................................. 3, 4, 5

Having filed a $30 million federal lawsuit against four Uniontown residents for exercising their rights to organize and engage in core political speech, plaintiffs now seek to deprive them of the counsel of their choice by filing a "motion to deny"[1] the defendants' motions for admission *pro hac vice* of Lee Rowland, Benjamin Good, Dennis Parker, and Rachel Goodman (the "ACLU lawyers"). Plaintiffs complain that a hypothetical jury trial has been tainted by the ACLU's publication of a proposed "General Release and Settlement Agreement" (the "Proposal") drafted by plaintiffs' counsel. Plaintiffs' counsel sent this Proposal to defendants, entirely outside of any litigation or settlement negotiations, with a unilateral (and baseless) request that it be kept confidential. Among other things, the Proposal would have required "defendants"—who had not yet been sued—to withdraw a previously-filed federal civil rights complaint in order to avoid the present litigation. The plaintiffs' attempt to prevent defendants from publicizing the Proposal is entirely consistent with their disregard for the First Amendment.[2]

The absence of case law in plaintiffs' brief is telling. Controlling cases plainly demonstrate that *pro hac vice* applications must be granted absent a clear ethical violation that would justify *disbarment*—an argument that plaintiffs, who bear the burden of proving any such violation, have not even made and certainly could not support. As explained more fully below, the defendants' motions for admission *pro hac vice* of the ACLU lawyers should therefore be granted.

---

[1] The plaintiffs' filing is styled as a "motion," but has been filed in opposition to the motions for *pro hac vice* admission by the defendants' lawyers. Defendants thus conform this brief to the requirements of a Reply brief pursuant to Civ. L.R. 7(e).

[2] *See generally* Am. Compl. (Doc. 10), Defs.' Mot. Dismiss (Doc. 15), and Mem. Supp. Defs.' Mot. Dismiss (Doc. 16).

**1. The Court must grant a *pro hac vice* application absent a finding of an ethical offense justifying disbarment.** "Admission to a state bar creates a presumption of good moral character" that can be overcome only by "a showing of unethical conduct rising to a level that would justify disbarment." *Schlumberger Techs., Inc. v. Wiley*, 113 F.3d 1553, 1559, 1561 (11th Cir. 1997). Absent such a showing, "the court *must* admit the attorney." *Id.* at 1561 (emphasis in original). Plaintiffs have made no argument that publication of the Proposal could conceivably result in disbarment, nor have they provided factual or legal arguments to demonstrate why the strong presumption of good character has been overcome in this case. The ACLU lawyers have not engaged in any unethical conduct (see Point 2, below), and certainly no conduct that would justify disbarment. Their applications therefore must be granted.[3]

**2. The ACLU lawyers have not committed any ethical violation.** Plaintiffs' motion to deny *pro hac vice* admission is based exclusively on the bare allegation that the ACLU lawyers violated Rule 3.6(b)(5) of the Alabama Rules of Professional Conduct, which bars extrajudicial statements that "refer[] to a civil matter triable to a jury" when such statements disclose information a lawyer "knows or reasonably should know" is "likely to be inadmissible as evidence in a trial and would if disclosed create a substantial risk of prejudicing an impartial trial." As explained in more detail below, there was nothing unethical about publishing the Proposal because (a) it would likely be admissible at trial as relevant to any counterclaims defendants might file were the case to continue and (b) its publication posed no "serious and

---

[3]     Under *Schlumberger*, procedural protections also apply: "[I]f a District Court has evidence of behavior that it believes justifies denying an attorney admission *pro hac vice*, it must give the attorney adequate notice of the ethical charges and set a hearing on the issue." 113 F.3d at 1559 (quotation marks omitted). Where a *pro hac vice* application is improperly denied, a writ of mandamus is available as a remedy. *In re Evans*, 524 F.2d 1004, 1008 (5th Cir. 1975). *Evans* is controlling precedent, as the Eleventh Circuit has adopted as precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

imminent threat" of interference with the right to a fair trial. *Chi. Council of Lawyers v. Bauer*, 522 F.2d 242, 249 (7th Cir. 1975); *see also* Comment to Ala. R. of Prof'l Conduct 3.6 ("The standard to be applied . . . is the 'serious and imminent threat' test . . . .").

**2a. Rule 408 is not likely to bar admission of the Proposal should this case proceed to trial.** The plaintiffs contend that the Proposal would be inadmissible at trial under Rule 408 of the Federal Rules of Evidence. That rule, however, bars only offers to "compromise[] or attempt[] to compromise [a] claim." Fed. R. Evid. 408(a)(1). The Proposal was not an offer of compromise. It was not made in the context of any settlement discussions. It was a one-sided attempt to extract crushing concessions from individuals with virtually no financial resources— including, among other demands entirely unrelated to this lawsuit, a requirement that the defendants withdraw a previously-filed complaint under Title VI of the Civil Rights Act.[4] Applying Rule 408 to the Proposal at this stage of the case, in order to justify denial of defendants' chosen counsel, would be improper. Nor would it further the "public policy of promoting settlements" that the rule was designed to protect. Fed. R. Evid. 408, Advisory Committee Comment to 2006 Amendment; *see also Blu-J, Inc. v. Kemper C.P.A. Grp.*, 916 F.2d 637, 642 (11th Cir. 1990) ("[T]he test for whether statements fall under this rule is whether the statements or conduct were intended to be a part of the negotiations toward compromise." (quotation marks omitted)). The Proposal was delivered in the hope of silencing public criticism and civil rights advocacy, not in service of resolving a meritorious lawsuit. *See Resolution Trust Corp. v. Blasdell*, 154 F.R.D. 675, 681 (D. Ariz. 1993) ("Because this [settlement demand] was presented to prove motive rather than liability, Rule 408 does not render it inadmissible.").

---

[4]     The Proposal was incorporated into the plaintiffs' motion, Doc. 22 ¶ 4 n.1.

Rule 408, moreover, does not bar evidence used to support a "claim . . . based upon [a] wrong that was committed in the course of the settlement discussions." *Uforma/Shelby Bus. Forms, Inc. v. N.L.R.B.*, 111 F.3d 1284, 1293 (6th Cir. 1997); *see also Carney v. Am. Univ.*, 151 F.3d 1090, 1095 (D.C. Cir. 1998) (holding settlement letters admissible "to establish an independent violation (here, retaliation) unrelated to the underlying claim which was the subject of the correspondence (race discrimination)."). Defendants believe that a demand that they drop an existing federal civil rights claim or face a $30 million lawsuit does in fact constitute wrongdoing. While it would be premature at this stage of the litigation—with a motion to dismiss pending—to litigate the merits of possible counterclaims, there is a significant likelihood that the Proposal would be relevant to counterclaims for retaliation[5] and abuse of process,[6] and even perhaps a separate lawsuit for malicious prosecution.[7]

All of this is inevitably speculative at this juncture, but this uncertainty further underscores the impropriety of leveraging Rule 408—which, after all, governs the admissibility of evidence *at trial*—to oppose *pro hac vice* motions filed at the very outset of the litigation. It is, in any event, impossible to conclude at this stage that the Proposal is "likely to be inadmissible as evidence at trial." Ala. R. of Prof'l Conduct 3.6(b)(5). The issue before the Court

---

[5] Environmental Protection Agency ("EPA") regulations provide that "[n]o applicant, recipient, nor other person shall intimidate, threaten, coerce, or discriminate against any individual or group . . . [b]ecause the individual has filed a complaint or has testified, assisted or participated in any way in an investigation, proceeding or hearing under this part, or has opposed any practice made unlawful by this regulation." 40 C.F.R. § 7.100.

[6] "The elements of the tort of abuse of process are 1) the existence of an ulterior purpose, 2) a wrongful use of process, and 3) malice." *Kmart, Inc. v. Asaro*, 751 So. 2d 513, 516 (Ala. Civ. App. 1999).

[7] "The elements of malicious prosecution are: 1) a judicial proceeding initiated by the defendant in the later malicious-prosecution action, (2) the lack of probable cause, (3) malice, (4) termination in favor of the plaintiff in the later malicious-prosecution action, and (5) damage." *Kmart*, 751 So. 2d at 515–16 (alterations omitted); *see also Allen v. Molton, Allen & Williams Realty Co.*, 495 So. 2d 27, 30 (Ala. 1986) (applying probable cause standard to wrongful civil filing).

is solely the *pro hac vice* admission of ACLU counsel; the court is not being asked to, nor is it in an optimal position to, evaluate the admissibility of trial evidence at this time—an issue that may never arise at all.

**2b. Publication of the settlement agreement posed no risk of interfering with trial, and was therefore constitutionally protected.** Even if the Proposal were "likely to be inadmissible at trial" under Rule 408, publication of the agreement did not violate Rule 3.6. Without the existence of a threat to a fair jury trial, there is no basis for abridging an attorney's First Amendment right to speak publicly about a case. *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1044, 1063–76 (1991). In Alabama, the governing standard requires a "serious and imminent threat" of interference with a fair trial before an attorney's speech may be curtailed. *Bauer*, 522 F.2d at 249.

In applying this principle, the Supreme Court has held that a state ethics rule proscribing extrajudicial statements cannot constitutionally be applied to statements made long before trial, because such statements pose no realistic threat of tainting the eventual jury. *See Gentile*, 501 U.S. at 1044 (plurality opinion) ("[E]xposure to the . . . statement six months prior to trial would not result in prejudice, the content fading from memory long before the trial date."); *see also Joyce v. Town of Dennis*, 736 F. Supp. 2d 321, 325 (D. Mass. 2010) (attorney's public statement about inadmissible settlement communication was non-prejudicial). *Gentile* is on all fours with the present case: there is no chance of a jury trial at any point in the near future, and, accordingly, no basis for sanctioning the ACLU lawyers for speaking publicly about a case of immense public importance.[8]

---

[8]  "Prejudice" under Rule 3.6(b) is cognizable in a civil trial only to the extent it may have an effect on the jury. *See* Ala. R. Prof'l Conduct 3.6(b) (referring to statements about "a civil

**3. The plaintiffs' concerns about prejudice are disingenuous.** The plaintiffs themselves have made or published numerous public statements that impugn the integrity of the defendants—repeatedly accusing them in newsletters and statements to the local media of "blatant dishonesty."[9] Having themselves flooded the community with relevant and damaging publicity, the plaintiffs' concerns about prejudice from extrajudicial communications and their emphasis on confining communications to the courtroom ring hollow. As the Third Circuit has explained:

> We are not so naive as to believe that there is no exception to the admonition that lawyers are to try their cases only in the courtroom. There may be circumstances where conscientious lawyers must act to defend against adverse publicity where their clients have been tried and convicted by the media long before trial, or where the opposing litigants . . . have blanketed the community with damaging publicity.

*Heffernan v. Hunter*, 189 F.3d 405, 414 (3d Cir. 1999). Plaintiffs' claim of potential prejudice is particularly bold when their own direct communications to the very community from which a jury pool will be drawn accuse the defendants' community group of "blatantly promot[ing] falsehood to further their agenda . . . ." Ex. B.

**4. The defendants have a due process right to the counsel of their choice.** This right can be overcome only if a court finds that "the choice would interfere with the orderly administration of justice." *In re BellSouth Corp.*, 334 F.3d 941, 956, 958–960 (11th Cir. 2003); *see also Sanders v. Russell*, 401 F.2d 241, 245 (5th Cir. 1968) ("[A] federal court is required to use common law powers to facilitate, and not to hinder, proceedings in vindication of civil

---

matter *triable to a jury*, a criminal matter, or any other proceeding that could result in incarceration" (emphasis added)).

[9]     *See, e.g.*, *Green Group Holdings Files Civil Action Against Opposition Group*, Marion Times-Standard (Apr. 13, 2016) (attached as "Exhibit A") (quoting Green Group President and CEO as saying, "Time and again, Black Belt has resorted to blatant dishonesty in its portrayal of Arrowhead"); Ron Miller, *Speaking Truth Against Lies*, Green Group Community Newsletter (June 2016) (attached as "Exhibit B") (article by Uniontown commissioner in Green Group publication accusing the defendants of blatant lying).

rights." (quotation marks omitted)). For the reasons explained above, there is no threat in this case to the orderly administration of justice,[10] and the plaintiffs' attempt to deprive the defendants of the counsel of their choice therefore should not be countenanced. *See Potashnick v. Port City Constr. Co.*, 609 F.2d 1101, 1119 (5th Cir. 1980) (finding the right violated where court interfered with counsel's ability to represent civil litigant); *see also FTC v. Lalonde*, 545 F. App'x 825, 832 (11th Cir. 2013) (per curiam) ("A civil litigant has the right to retain counsel of his choice under the Fifth Amendment's Due Process Clause." (citing *Potashnik*, 609 F.2d at 1117–18)).

For the reasons explained above, the defendants respectfully request that the Court grant the motions for admission *pro hac vice* of Lee Rowland, Benjamin Good, Rachel Goodman, and Dennis Parker.

Respectfully submitted,

 /s/ Lee Rowland
Lee Rowland (*pro hac vice* pending)
Benjamin Good (*pro hac vice* pending)
Dennis Parker (*pro hac vice* pending)
Rachel Goodman (*pro hac vice* pending)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 549-2500
Fax: (212) 549-2654

 /s/ *Randall C. Marshall*
Randall C. Marshall (MARSR3023)
ACLU Foundation of Alabama
P.O. Box 6179
Montgomery, AL 36106-0179
Tel: (334) 420-1741
Fax: (334) 269-5666
Email: rmarshall@aclualabama.org

June 10, 2016

---

[10] Any threat of influencing the proceedings by exposing the Proposal to the Court is, of course, attributable to the plaintiffs having exposed the Proposal to the Court.

# EXHIBIT A

# Green Group Holdings Files Civil Action Against Opposition Group

## Allege 'Black Belt' Group Guilty of Libel and Slander in Statements Regarding Arrowhead Landfill

UNIONTOWN, Ala. – April 7, 2016 – Green Group Holdings today announced it has filed a civil action against the officers of Black Belt Citizens Fighting for Health and Justice, asserting that the group knowingly made or allowed the publication of false and defamatory statements regarding Arrowhead Landfill that have damaged its business and reputation.

In its lawsuit, Green Group states that Black Belt uses its Facebook page in a false and malicious manner to accomplish its stated goal of getting rid of Arrowhead Landfill. Posts to the Facebook page include several defamatory statements falsely portraying Arrowhead Landfill as a corrupt, intentional polluter of the Uniontown community.

"It really is a shame that we have been forced to take action in the courts to defend ourselves against these false accusations, but we have been left with no choice in the matter," said Ernest Kaufmann, president and CEO, Green Group. "Time and again, Black Belt has resorted to these efforts, and Green Group is one of the safest facilities of its kind in the entire country, and despite being the most heavily inspected landfill in Alabama, it has never once been cited for a violation."

Other posts on Black Belt's Facebook page falsely allege that Green Group desecrated a local cemetery. In fact, Arrowhead Landfill has been working with members of the local community to help restore and preserve New Hope Church Cemetery, and as a result of these efforts, a foundation dedicated to the perpetual care of the cemetery has been formed.

Green Group also asserts that on two occasions, members of Black Belt made similarly false and defamatory comments regarding Arrowhead Landfill with malicious intent and despite knowing they were false. The slanderous comments were made by Black Belt member Benjamin Eaton at a press conference organized by Black Belt and held on December 4, 2015 in Uniontown; and by Black Belt member Esther Calhoun on the nationally syndicated "Uprising in Son ali" radio show, which originates in Southern California.

"We want people to feel free to express their own opinions, but we have to draw the line when those opinions are knowingly false statements seeking to discredit the facility and the company," Kaufmann said. "Since taking over ownership, we have had and will continue to have an open door policy and allow anyone that wants to visit the site to contact us and we will provide access to anything they want to see at the facility."

About Green Group Holdings

Green Group Holdings, LLC, parent company of Arrowhead Landfill, is a development company that specializes in large-scale infrastructure development, environmental permitting, and operations for projects like industrial parks, water-supply facilities, transfer stations, facilities for processing recyclable materials, and solid waste landfills. With innovative designs and a commitment to transparency, the Green Group Holdings' leadership team has set the standard for large-scale environmental permitting and development projects. For more information, visit the Green Group Holdings website at http://www.gghcorp.com/



| PERRY COUNTY SHERIFF'S DEPARTMENT | | | |
|---|---|---|---|
| Department: | | | |
| Arrests: | 4 | DUI | |
| | 1 | Assault | 2nd Degree |
| | 1 | Possession of Marijuana | 2nd Degree |
| | 1 | Possession of Forged Instr | |

# New Hope Church Cemetery update

Arrowhead Landfill has been working with members of the local community to help restore and preserve New Hope Church Cemetery, a historically and culturally significant site in Perry County. As a result of these efforts, a foundation dedicated to the perpetual care of the cemetery has been formed.

The New Hope Church Cemetery Foundation will ensure that the cemetery is controlled by the descendants of those buried there. Although the cemetery once lied within the boundary of lands owned by Arrowhead Landfill, Arrowhead has deeded the Foundation the cemetery and the acreage immediately surrounding it. Arrowhead is now working with Foundation members to clean up the cemetery and will provide appropriate signage to allow for communication with heirs of those interred at the cemetery.

In addition, Arrowhead will work with the Foundation to set up and maintain a social media site to allow for communication with heirs of those interred at the cemetery.

Clean-up and clearing of the New Hope Church Cemetery, Feb 2015 . . . . photo in folder

http://www.arrowheadlandfill.com/community-benefits/

# EXHIBIT B

# COMMUNITY NEWSLETTER



GREENGROUP
*| arrowhead landfill*

## Arrowhead Water Redirection

Booker Gibson, our neighbor on the south side of Arrowhead Landfill, notified the Alabama Department of Environmental Management (ADEM) about storm water draining onto his land. The water appeared to flow from the direction of the Arrowhead landfill, so ADEM investigated and found the water was uncontaminated. ADEM also did not find any problem with the site's drainage plans, as the uncontaminated storm water has always flowed southwards.

However, we wanted to see if the water could be re-routed to alleviate Mr. Gibson's concerns. Our engineers established plans that called for reversing the direction of the water using new pipes and ditches. ADEM approved these plans in January and John Sikes, the onsite general manager, began work on the new drainage system in March. The work was completed before the last week of March. Seeds and mulch were spread over the project's grounds on April 4.



## Meet Michelle Coleman.

As Arrowhead Landfill's Office Manager, Michelle is essential to ensuring the Landfill's day-to-day operations run smoothly. She oversees truck transit, accounts payable, and payroll while also greeting visitors and facilitating community activities. →

12
1

UNIONTOWN AL 36786-0878
PO BOX 878
OR CURRENT RESIDENT
ELLIS LONG
3268 ·····ECRWSS**B 008

Presort Standard
U.S. Postage
PAID
San Antonio, TX
Permit No. 999

Michelle grew up in Orrville, Alabama with her mother, Laura Merchant and three siblings. She graduated from Keith High School and went on to earn an Associate Degree in Business and Administration, a Bachelor Degree in Human Resource Management, and a Masters Degree in Post-Secondary Education. After working for the Selma Times, Michelle joined the Arrowhead Landfill team in December of 2014.

*"At first I was just looking for a job," says Coleman. "I didn't know I was signing on to be part of a family!"*

Michelle also has a family of her own. She is married to Arthur Coleman, and has been for 14 years. She has two sons, Kendarious (19) and LaDaroius (17), and a daughter named Chantavia (14). Spending time together is her family's priority, whether it is traveling, attending church, seeing movies, eating dinner, or just barbecuing in the backyard.

While on the job, Michelle enjoys meeting new people and working with the Uniontown community. She believes Arrowhead is a value to the community by providing well-paying jobs and free backpacks and school supplies for all the students in Perry County.

"The landfill site is as nice as could be and there isn't even an odor," says Coleman. She is always ready to welcome anyone to the facility with a smile.

Michelle is very passionate about her religious faith and serves as the Youth Director President at the First Baptist Church of Orrville. On her own time, she enjoys traveling, shopping, and doing yard work around her home.

# Arrowhead Landfill Teams with Local Residents to Preserve Historic New Hope Church Cemetery

Arrowhead Landfill has been working with members of the local community to help restore and preserve New Hope Church Cemetery, a historically and culturally significant site in Perry County. As a result of these efforts, a foundation dedicated to the perpetual care of the cemetery has been formed.

The New Hope Church Cemetery Foundation will ensure that the cemetery is owned and controlled by the descendants of those buried there. Although the cemetery once lied within the boundary of lands owned by Arrowhead Landfill, Arrowhead has deeded the Foundation the cemetery and the acreage immediately surrounding it.

Arrowhead is now working with Foundation members to clean up the cemetery and will provide appropriate signage noting its historical significance. In addition, Arrowhead will work with the Foundation to set up and maintain a social media site to allow for communication with heirs of those interred at the cemetery.

Arrowhead offers a uniquely designed, high capacity and environmentally sound disposal facility for customers, communities and a wide range of industries across 33 states. Located above one of the most impermeable naturally occurring clay formations in North America – the Selma Chalk Formation – Arrowhead is among the most environmentally sound disposal facilities in the nation.

*For more information about the cemetery restoration and to read the final report, please visit our website at www.arrowheadlandfill.com or call the office at (334) 628-4844 to receive a copy of the report in the mail.*

# Speaking out against the lies.

By Commissioner Ron Miller

*In recent years, a continuous stream of half truths and outright falsehoods concerning Arrowhead Landfill and its disposal of coal ash have been allowed to perpetuate, thanks to the questionable efforts of certain opposition groups, most notably Black Belt Citizens Fighting for Health and Justice. These charges, which continue to this day, have too often and for too long gone unchallenged in both local and national media. It is time to dispel these myths and set the record straight once and for all.*

As a lifelong resident and former council member of Uniontown and chair of the Perry County Commission, I feel uniquely qualified to do just that. But perhaps nothing makes me more of an authority on this issue than the fact that I live just over one-half mile east of Arrowhead Landfill and neither I nor my family have ever experienced any sort of adverse effects.

Of course, if groups like Black Belt are to be believed, Arrowhead is a shoddily constructed facility operated by people with no regard for the health and well-being of the local community. Let me assure you, that is pure fantasy.

**THE TRUTH**
Arrowhead Landfill is one of the safest facilities of its kind anywhere in the country.

This is not some uninformed opinion. I say this because in my elected positions of city councilman and county commissioner, I have had closer contact with the landfill and its management and ownership than most people in the community. I attended meetings in which the design and operation of the landfill were discussed extensively. I was briefed at length on safeguards put into place – including groundwater, surface water and air monitoring programs – during the 2009-2010 timeframe when coal ash was accepted at the landfill.

The truth is, Arrowhead Landfill is one of the safest facilities of its kind anywhere in the country, with multiple layers of groundwater protection, a groundwater monitoring system, and an extensive drainage system that removes rainwater and liquid from the waste 24-hours a day. But what makes it ideally suited for the disposal of coal ash is its location over the Selma Chalk Foundation, one of the most impermeable naturally occurring clay formations in North America, which forms a natural barrier between the landfill waste and the underlying aquifer. It would take literally hundreds, if not thousands, of years for water to pass through this chalk.

But such facts do not stop groups like Black Belt from needlessly alarming local residents with scary but false claims of coal ash polluting our community's air and water. No proof or third party evidence supporting these allegations is ever offered up, of course. Not surprisingly, their claims are easily debunked. Regular inspections by the Alabama Department of Environmental Management confirm that no coal ash is escaping Arrowhead Landfill. Detailed reports are publicly available on the ADEM website for anyone to see.

In two of its more brazen examples of dishonesty, Black Belt has suggested that the landfill lacks a cover (it does not) and that one of the layers of an EPA-required liner is missing (it is not). Not only is Arrowhead Landfill in full compliance with both the EPA and ADEM, it has never been cited for a single violation from either, despite it being the most inspected landfill in Alabama.

In regards to Green Group Holdings, I can say that having interacted with all previous owners and operators of Arrowhead Landfill, they are easily the most open and community-minded. Immediately upon taking ownership in December 2011, Green Group made an effort to introduce themselves and solicit ideas for how they could best be involved in the community. This led to the creation of a community involvement group with whom they discussed and prioritized needs within the community. As a result, proactive steps were taken such as relocating the main entrance to the landfill for the convenience and safety of neighbors, improving local parks, and helping to restore a historic church cemetery, to name a few.

I have not even touched on the economic benefits of Arrowhead Landfill to Uniontown and Perry County in the form of jobs, millions of dollars in host fees, and savings due to free garbage disposal at the landfill.

Concerns over a landfill are understandable and valid, and everyone should take an active interest in the environmental well-being of his or her community. But when groups like Black Belt so blatantly promote falsehoods to further their agenda, and make allegations that are so easily disproven, they lose all credibility and should be judged accordingly: with extreme skepticism.



## Did you know?

The landfill, which is permitted by the Alabama Department of Environmental Management (ADEM), is located above the Selma Chalk, one of the most impermeable naturally occurring clay formations in North America, making Arrowhead one of the most environmentally secure disposal facilities in the nation.

## Are you curious about the Arrowhead Landfill?

## Would you like to take a tour of the site?

Please call **(770) 720-2717** to arrange a tour today!
We can host individuals, community groups, and organizations.

# In the Community

**NEW LAPTOPS**

Arrowhead donated four new laptop computers to the Uniontown Police Department.

**EARTH DAY**

Arrowhead celebrated Earth Day by assisting the Tender Loving Care Coalition Builders of Uniontown by giving supplies for the school and city-wide clean up. "Because of your gift, our entire clean-up experience was safe and smooth," said Shirley Walker, Uniontown Coordinator.

**HWY 80 PARK**

We love supporting our community park. Arrowhead supplied new flowers and shrubs to the park. If you haven't been out to the park lately, we hope you will go and check it out.





GREENGROUP
| arrowhead landfill